David R. Paoli
Paoli, Latino & Kutzman, P.C.
257 West Front Street, suite A
P.O. Box 8131
Missoula, MT 59802
Telephone: (406) 542-3330

Stephen D. Ochs, M.D., J.D.
805 South Reserve St.
Missoula, MT 59804

        *Attorneys for Plaintiffs*

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MONTANA
## BILLINGS DIVISION

| | |
|---|---|
| DENISE FABRIZIUS and WILLIAM FABRIZIUS, Plaintiffs, | Cause No.: 08-114-BLG-RFC |
| vs. DR. KEITH R. SHULTZ, M.D., YELLOWSTONE YSC, DOES 1 through X, and DOES 1 through X, inclusive, | **PLAINTIFFS' STATEMENT OF UNDISPUTED FACTS RE: PLAINTIFFS' MOTIONS FOR SUMMARY JUDGMENT** |
| Defendants. | |

Plaintiffs Denice and William Fabrizius ("Denice" and "Bill") submit

this Statement of Undisputed Facts in support of their Brief in Support of

their Motion for Partial Summary Judgment Regarding Yellowstone Surgery

Center's ("YSC") Liability for Dr. Shultz's Actions.  This Statement is divided

into two parts, the facts surrounding Denice's injury at YSC and the facts which create the relationship between Dr. Shultz and YSC.

## INJURY FACTS

1.    Denice obtained the medical evaluation of Dr. Michael Copeland (Dr. Copeland) as a second opinion regarding possible treatment for neck pain.  [Depo. Denice Fabrizius, Exhibit 1, 88:23 – 89:4].

2.    Dr. Copeland examined Denice on November 10, 2004.  [Depo. Dr. Michael Copeland, Exhibit 2, 9:18-22].

3.    Dr. Copeland determined Denice suffered from cervical spondylosis and suggested she receive a C6-7 epidural steroidal injection.  [Id. at 22:25-24:18].

4.    Dr. Copeland referred Denice to YSC for an epidural steroidal injection on November 10, 2004.  [Patient Referral, Exhibit 3].

5.    Immediately following her exam with Dr. Copeland, Denise went to YSC.  [Exhibit 1, 91: 19-21].

6.    Upon arriving at YSC, Denice met with Dr. Keith Shultz (Dr. Shultz).  [Id. at 101: 4 10].

7.    Dr. Shultz has practiced with, and been a shareholder of, Anesthesia Partners of Montana since 1999.  [Depo. Dr. Keith Shultz, Exhibit 4,

10:1-15].   He practices only at YSC and St. Vincent Healthcare, and

has done so since 2002.  [Id. at 9:24-10:5-8].

8.   Paresthesia is an abnormal sensation in a nerve resulting in shooting

or electric feelings of pain.  [Id. at 31:22 – 32:2, 32:18 – 33:4].

9.   In light of an ongoing epidural injection, paresthesia can be indicative

of the inserted needle irritating a nerve due to being in too close of

proximity to the nerve.  [Id. at 34: 7:15].

10.   If an epidural nerve block is performed in light of ongoing paresthesia,

the affected nerve may be damaged or injured.  [Id. at 35:14-20,

36:13-17].

11.   The national standard of care with respect to epidural nerve blocks

dictates that such blocks not be performed when a patient exhibits

ongoing paresthesia because doing so can result in nerve injury.  [Id.

at 136:25 – 137:10].

12.   Dr. Shultz was aware of this standard of care.  [Id.].

13.   When a patient exhibits paresthesia different from the pain for which

they are being treated, doctors, including Dr. Shultz, pull the needle

back and redirect it.  [Depo. Teresa Harris, Exhibit 5, 57:8-25].

14.   Faced with confusing information regarding Denice's symptoms as

compared to the requested injection, Dr. Shultz began performing the

epidural injection as requested by Dr. Copeland without seeking

clarification or additional consultation. [Exhibit 4, 109:11-110:15].

15.  Dr. Shultz had exclusive control of the needle used to perform the

epidural steroidal injection. [Id. at 110:16-116-14].

16.  As Dr. Shultz proceeded with the injection, Denice exhibited, and Dr.

Shultz recognized, signs of paresthesia in her left arm. [Id. at 113:23-

114:3].

17.  With the needle still in Denice's neck, Dr. Shultz heard her complain

of pain in her arm and he noticed that she raised up and jumped. [Id.

at 114:14-115:21]. Denice's arm, head, neck and shoulders made

certain and sudden jumps. [Id. at 118:1-6].

18.  Denice informed Dr. Shultz that her left arm felt as though it had been

"electrocuted," her hands were "burning" and "it hurt really bad." She

felt her arm involuntarily straighten in front of her. [Exhibit 1, 104:8-

25].

19.  After Denice complained to Dr. Shultz about the pain, he asked her to

hold still so he could finish. [Id.]

20.  Dr. Shultz got Denice back down into position and continued with the

procedure. [Exhibit 4, 115:25 – 116:14].

21.  He did not redirect the needle. [Exhibit 5, 62:10-13].

22.  Within an hour of the procedure, Dr. Shultz completed a report
     detailing the procedure. [Exhibit 4 at 117:4-13]. In his procedure
     note, Dr. Shultz noted Denice's "paresthesia *seems to improve* after
     subsequent negative aspiration of 40 mg of Kenalog followed by
     0.25% of Marcaine 1 cc was injected without difficulty." This original
     report does not state Denice's paresthesia was resolved when Dr.
     Shultz completed the procedure. [Dr. Shultz's Post Operative Report,
     entered November 16, 2004, Exhibit 6, Pg. 2].

23.  After the procedure, the intensity and scope of Denice's pain
     increased dramatically and she began crying. [Exhibit 1 at 110:12-
     112-25].

24.  Nurse Wald of YSC noted Denice's post operative pain score to be an
     eight and described Denice as "tense" and "frowning" when Denice
     arrived in post-opt. [Nurse Wald's post operative report Exhibit 7].

25.  Denice experienced new and different shooting pains in her left arm
     immediately after the epidural than she had complained of prior to the
     epidural. [Exhibit 4, 143:14 – 144:3].

26.  Dr. Shultz typically does not prescribe narcotics to post epidural
     patients. [Id. at 134:6-9].

27. Dr. Shultz does not prescribe narcotics to patients absent an exam determining such medication is physically necessary. [Id. at 135:24 – 136:4].

28. While it is typically not required of patients receiving an epidural nerve block, Dr. Shultz prescribed Vicodin, a narcotic, to treat Denice's post operative pain. [Id. at 144:23 – 146:17].

29. Due to the intensity and continuation of the pain, Denice sought care at St. Vincent's Healthcare emergency room the next morning. [Exhibit 1 at 119:9-11].

30. Dr. Shultz was aware of Denice's ongoing left arm pain and that she had sought treatment from various doctors in the days following the procedure. [Exhibit 4, 129:15-21].

31. Dr. Shultz altered his procedure note one to two weeks after the procedure. [Id. at 128:17-22].

32. Dr. Shultz struck the words "seems to" from the report. He did so because he felt the report "sound[ed] kind of wishy-washy, and [he] wanted to definitely say that [Denice's paresthesia] had improved or resolved before [he] did any more injection." [Id. at 130:1-10, Dr. Shultz's Altered Procedure Note, Exhibit 8, Pg. 2].

33.  Dr. Shultz did not change the word "improved" to "resolved" because he believes the two words mean the same thing. [Exhibit 4, 130:15-23].

34.  Merriam-Webster's Online Dictionary defines "improve" as meaning: "to enhance in value or quality: make better." [Merriam-Webster's Online Dictionary, Exhibit 9].

35.  Merriam-Webster's Online Dictionary defines "resolve" as meaning: "to deal with successfully: clear up." [Merriam-Webster's Online Dictionary, Exhibit 10].

36.  Ultimately, Denice sought care from Dr. Michael Crosby. Dr. Crosby determined Denice suffered from reflex sympathetic dystrophy of the left upper extremity with trophic changes of the hand and loss range of motion of her hand. This debilitation was caused by the epidural steroid injection. [Dr. Crosby's Procedure Report, Exhibit 11].

37.  Dr. Alan Brewer, DDS, MD, Board Certified by the American Board of Anesthesia and the American Board of Pain Management determined from examining Denice and reviewing her medical records that Dr. Shultz:

    a. breached the standard of care in performing the epidural block on Denice;

> b. knew, or should have known, that performing such procedures in light of paresthesia risked nerve injury; and
>
> c. knew or should have known, the pains Denice experienced during the procedure were indicative of the needle being in contact with the spinal cord or a nerve.

[Medical Report, Dr. Alan R. Brewer, DDS, MD, Board Certified by the American Board of Anesthesia and American Board of Pain Management, Exhibit 12].

38. Dr. Brewer states the applicable standard of care when performing any nerve block is to never inject in face of a persisting and unresolved paresthesia and pain elicited by the needle placement in order to prevent any permanent injury to the spinal cord or any nerve. [Id.].

39. Dr. Brewer states Dr. Shultz should have completely removed the needle and reinserted it when Denice exhibited signs of paresthesia or have not performed the procedure at all.  [Id.].

## FACTS DETAILING THE RELATIONSHIP BETWEEN DR. SHULTZ AND YSC

40. YSC is a surgery center located in Billings, Montana.  It provides treatment in at least seven medical specialties, from at least fifty

doctors, of which, at least forty are shareholders in YSC. [Current

YSC Internet Webpage, Exhibit 13].

41.  On October 1, 2002, YSC entered into an exclusive contract

(Contract) with Anesthesia Partners to provide anesthesia services

for all procedures performed at YSC. [Agreement of Anesthesia and

Medical Director Services, Exhibit 14, Pg. 1].

42.  Dr. Shultz is also a shareholder in YSC. [Exhibit 4, 217:10-17].

43.  Anesthesia Partners and YSC have maintained this relationship from

2002, through the time of Denice's procedure, to the present, nearly

seven continuous years. [Exhibit 4, 10:16 – 11:3, Exhibit 10].

44.  Through this contractual relationship, YSC maintains, among others,

the following controls over the anesthesiologists of Anesthesia

Partners:

   1.  YSC must provide prior approval of any
       anesthesiologist Anesthesia Partners provides to
       work in YSC. [Exhibit 14, § 2.1, 4.1];

   2.  The Contract compels all anesthesiologists to do the
       following:

       a.    complete medical records as
             required by YSC's policies and
             procedures;
       b.    participate in resolving patient
             complaints;
       c.    serve on YSC committees;
       d.    participate in YSC education;

e.      participate in YSC's problem
        solving, budget and strategic
        planning, preparing for quality
        assurance surveys;

f.      provide YSC patients with timely
        and efficient service;

g.      comply with all YSC policies and
        standards.
        [Id. at § 2.4];

3.      YSC reviews and evaluates each doctor for
        compliance with its standards of performance.
        [Id.];

4.      Article 3 of the Contract requires
        anesthesiologists to provide services for
        YSC's patients upon request, as well as
        consult, advise and provide a written report
        regarding the care provided.  [Id. at § 3.1];

5.      While attempting to create independent
        contractor status for the anesthesiologist, the
        Contract explicitly states YSC maintains the
        "sole interest and responsibility . . . to assure
        [anesthesia services] are performed in a
        competent, efficient and satisfactory manner."
        [Id. at § 3.4];

6.      YSC retains sole control of the operating time
        in which the anesthesiologist may perform
        their duties and requires the anesthesiologists
        not leave the facility until patients are
        medically stable.  [Id. at § 3.7(a), (d)];

7.      YSC controls the income of the
        anesthesiologist in that it requires Anesthesia
        Partners to recognize some days may be fully
        scheduled and others may not, yet the
        anesthesiologists are required to stay on staff

in either event.  [Id. at § 3.7(e) in combination with § 3.7(a)];

8.      YSC controls the anesthesiologists' ability to choose where they may or may not practice by requiring all anesthesiologists to maintain medical staff and admitting privileges at St. Vincent's Healthcare.  [Id. at § 4.1];

9.      YSC provides the space for the anesthesiologist to perform their work and prohibits the use of any space for private practice.  [Id. at § 5.1];

10.     YSC furnishes and maintains at its expense all necessary equipment for the anesthesiologist.  [Id. at § 5.2];

11.     YSC maintains the sole right to approve and purchase, lease, or pilot trial all supplies, equipment and personnel to enable the anesthesiologists perform their trade. [Id. at § 5.3-5.6];

12.     Anesthesiologists are not allowed to use their own staff to assist them perform their trade. [Id. at § 5.7];

13.     While it does not collect the anesthesiologists' receivables, YSC does provide appropriate forms and information.  [Id. at § 6.1(a)];

14.     Only when practical does YSC "endeavor" to inform patients of the separate billing structures.  [Id. at § 6.1(b)];

15.     YSC mandates no anesthesiologist shall refuse, delay or cancel treatment based on the financial resources of any patient. [Id. at § 6.2];

16.     Each party retains the right to terminate the
        Contract with or without cause providing the
        stated notice.  [Id. at § 8.2, 8.3]; and

17.     YSC retains the control of all patient records,
        even in the event of the Contract's
        termination.  [Id. at § 13.2].

45.  The Contract excludes "treatment for management of chronic pain

     and painful disorders not done in conjunction with surgery or

     obstetrics."  [Exhibit 14, § 2.5].

46.  However, YSC allowed anesthesiologists to perform epidural pain

     blocks to chronic pain patients as a practice and had done so since

     opening.  [Depo. Robert Gagnon, Exhibit 15, 20:10-15; Exhibit 5,

     10:8-21].

47.  YSC dedicated a suite in its offices specifically for such procedures.

     [Exhibit 5, 8:23-25].

48.  YSC specifically employed nurses to assist anesthesiologists perform

     chronic pain blocks and had done so since YSC's inception.  [Id. at

     10:12-21].

49.  YSC had five anesthesiologists able to perform epidural pain blocks.

     [Id. at 10:22-11:8].

50.  Dr. Shultz was one of the five anesthesiologists at YSC to do epidural

     pain blocks.  [Id.].

51.   As a surgery center, YSC is charged with ensuring that the medical staff is legally and professionally qualified.  [Defendant YSC's Expert Medical Report, A. Craig Eddy, M.D., J.D., Exhibit 16, Pg. 3].

52.   YSC delegates its duty to ensure the doctors practicing at YSC are properly credentialed to Rocky Mountain Health Network (RMHN). [Id.].

53.   YSC's credentialing committee uses the information provided by RMHN to determine whether its doctors should be granted treatment privileges.  [Id. at Pg. 4].

54.   Once YSC provides treatment privileges to a doctor, it is charged with a duty to periodically reappraise the doctor to determine if the doctor is properly qualified.  Towards this end, YSC holds regular quality control meetings, monitors complications and presents patient complications to its Medical Executive Committee.  [Id.].

55.   While it could have recommended Dr. Shultz be proctored or monitored when performing epidural injections to patients, it chose not to.  Instead, YSC granted Dr. Shultz full privileges.  [Id.].

Dated this 31st day of August, 2009.


 /s/ David R. Paoli                .
David Paoli
Paoli, Latino, Kutzman, P.C.
257 West Front Street
P. O. Box 8131
Missoula, MT 59802
*Attorney for Plaintiffs*