Richard E. Gillespie
KELLER, REYNOLDS, DRAKE,
 JOHNSON & GILLESPIE, P.C.
50 South Last Chance Gulch
P.O. Box 598
Helena, MT  59624-0598
Telephone:  (406) 442-0230
Fax:          (406) 449-2256
E-mail:      regillespie@kellerlawmt.com

Attorneys for
  YELLOWSTONE SURGERY CENTER

### IN THE UNITED STATES DISTRICT COURT
### FOR THE DISTRICT OF MONTANA,
### BILLINGS DIVISION

| | | |
|---|---|---|
| DENICE FABRIZIUS and<br>WILLIAM FABRIZIUS,<br><br>Plaintiffs,<br><br>-vs-<br><br>DR. KEITH R. SHULTZ, M.D.,<br>YELLOWSTONE SURGERY<br>CENTER, DOES 1 through X, and<br>ROE CORPORATIONS I through X,<br>inclusive,<br><br>Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | Cause No. 08-114-BLG-RFC<br><br>Hon. Richard F. Cebull<br><br><br><br><br>**YSC MOTION FOR**<br>**SUMMARY JUDGMENT re**<br>**VICARIOUS LIABILITY**<br>**WITH BRIEF IN SUPPORT** |

* * * * * * *

## YSC MOTION re VICARIOUS LIABILITY

COMES NOW the Yellowstone Surgery Center [YSC], pursuant to *F.R.Civ.P. 56*, and moves for summary judgment holding that the YSC cannot be held vicariously liable for any culpability the Plaintiffs attribute to Dr. Keith Shultz.

The Plaintiffs oppose this motion.

## BRIEF IN SUPPORT

This argument also answers the Plaintiffs' motion for judgment on the same issue.

## Summary

The Plaintiffs rely on their interpretation of the terms of the Anesthesia Partners-YSC contract as their evidence for proving actual agency.  The only reasonable inferences and conclusions to be drawn from the evidence material to the applicable law, including cases cited by the Plaintiffs, are that Dr. Shultz was acting as an independent contractor.  The theory of nondelegable duty does not apply.  Denise Fabrizius eliminated the possibility of an ostensible agency.  Summary judgment in favor of the YSC is appropriate.

## Applicable Law

This being a *28 U.S.C. §1332(a)(1)* diversity case, state substantive law and federal procedural law apply.  *Erie R.R. v. Tompkins,* 304 U.S. 64, 78, 58 S.Ct. 817, 822, 82 L.Ed. 1188 (1938); *Feldman v. Allstate Insurance Company*, 322 F.3d 660, 666 (9th Cir. 2003).

## General Rule

Generally, a Montana healthcare facility is not liable for the negligence of physicians functioning as independent contractors.  *Butler v. Domin, et al.*, 2000 MT 312, ¶27, 302 Mont. 452, 459, 15 P.3d 1189, 1194, citing *Estates of Milliron v. Francke* (1990), 243 Mont. 200, 204, 793 P.2d 824, 827.

## Agency

"The law itself makes no presumption of agency, and the burden of proving agency, including not only the fact of its existence but also its nature and extent, rests ordinarily upon the party who alleges it." *Elkins v. Husky Oil Company* (1969), 153 Mont. 159, 165, 455 P.2d 329, 332.  In Montana, direct evidence of the right or exercise of control, the method of payment, furnishing of equipment, and the right to fire have been identified as the four factors used in determining whether a sufficient right of control existed to demonstrate an employer-employee

relationship, *i.e.*, an actual agency. *Butler*, ¶29. "Where the undisputed evidence concerning the status of the parties defendant to each other is reasonably susceptible of but a single inference, the question of their legal relationship ... is one purely of law." *Milliron*, 243 Mont. at 204, 793 P.2d at 827, quoting *Elkins*, 153 Mont. at 166, 455 P.2d at 332.

### Facts Material to the Issue

The statements in paragraphs 8 through 39 in *Plaintiffs' Statement of Undisputed Facts* [*PSUF*] are not material to the issue of whether the YSC can be held vicariously liable for any culpability the Plaintiffs attribute to Dr. Shultz. Though the Plaintiffs project Dr. Shultz's negligence and his liability as foregone conclusions, they have not moved for summary judgment on those yet to be decided issues.

Other statements are not material either.  The Plaintiffs have omitted material facts.  Some of their statements are factitious suppositions. Misperceptions or misstatements are extracted from relevant evidence.  Other statements rely on inadmissible evidence.  These subjects are discussed in detail in the *YSC Statement of Genuine Issues with Plaintiffs' Statement of Undisputed Facts* that has been incorporated by reference into the *YSC Response Brief to Plaintiffs' Motion for Partial Summary Judgment re Vicarious Liability*.

<u>Events Leading to the C6-7 Epidural Steroid Injection [ESI]</u>.  From what Denise Fabrizius and her doctor have testified, she made an appointment to see Dr. Michael Copeland, a Billings neurosurgeon, on November 10, 2004, for a second opinion regarding her pain symptoms.  *D. Fabrizius*, 88:19-89:12.[1]  When he reviewed previous MRI studies Dr. Copeland saw spondylosis "Most prominently

---

[1]Dkt. 30, Ex. 1.

at C6-7 but also at C4-5 and C5-6." *Copeland*, 17:14-18:9.[2]  However, he could not find diagnostic answers for the cause(s) of all of her symptoms.  *Id.*, 17:14-19:22, 20:22-21:5.  The confusion between the symptoms she described and his objective findings was why "... I sent her for an epidural to see if I could add some clarity."  *Id.*, 87:14-22.  He wanted to see if there was a treatable problem he could help, so a cervical ESI was the next test he wanted done.  *Id.*, 22:21-23:16.

Dr. Copeland had experience referring patients to Dr. Shultz for cervical ESIs.  *Id.*, 27:15-18.  He considered Dr. Shultz competent to perform them, *Id.*, 27:19-25, based on the excellent outcomes when he referred patients to him.  *Id.*, 73:7-74:3.  He recommended Mrs. Fabrizius see Dr. Shultz for the ESI.  *D. Fabrizius*, 168:4-8.  The way she remembers, "Dr. Copeland said something to the effect that if he knew somebody that was really good at this or -- he made me feel comfortable with the fact that Dr. Shultz would be a good doctor to go to to have this done."  *Id.*, 92:6-10.  Dr. Copeland lead her "to believe that he [Dr. Shultz] was a good doctor and was good at what he does;" and evidently, that he preferred Dr. Shultz do the ESI.  *Id.*, 168:4-12, 169:3-8.  During the consultation Dr. Copeland arranged and scheduled a C6-7 ESI.  *Copeland*, 26:13-27:14; *D. Fabrizius*, 91:12-18.  The purposes were to help him make a diagnosis, *Copeland*, 18:24-19:22, 20:19-21:5, 22:10-23, along with the hope of it being therapeutic for her.  *Copeland*, 22:24-23:13; *D. Fabrizius*, 91:6-9.  Dr. Copeland did not refer her to the YSC for the ESI as the Plaintiffs suggest.  *PSUF*, ¶4.

According to the evidence, he referred her to Dr. Shultz who happened to be at the YSC that day instead of St. Vincent Healthcare or elsewhere.  Mrs. Fabrizius knew Dr. Shultz would be doing the ESI before she went to the YSC.  *D.*

---

[2] Dkt. 30, Ex. 2.

*Fabrizius*, 91:12-92:10.  When she left Dr. Copeland's office she was going to see Dr. Shultz.  *Id*., 168:9-12.  As recently as June 16, 2009, the Plaintiffs definitively said, "The facts of Denice's claim are: 1. Denise sought the care of Dr. Shultz ...."  Dkt. 22, 6/16/2009 *Plfs' Reply Brief*, p. 15.  It didn't make any difference to her where he was; she was simply told he was at the YSC.  *D. Fabrizius*, 168:13-21.  She would have gone wherever he may have been.  *Id*., 169:9-11.  She said, "I don't know the way that would have even crossed my mind" when asked if she cared about Dr. Shultz's relationship with the YSC when she went to see him.  *Id*., 168:22-169:1.

Here, unlike in *Butler*, ¶30 and ¶31, the YSC informed Mrs. Fabrizius before the ESI that Dr. Shultz was an independent contractor and not its agent, servant or employee in paragraph 1 of the informed consent form[3] she signed:

> The Yellowstone Surgery Center maintains facilities and personnel to assist physicians and surgeons as they perform various surgical operations and other diagnostic or therapeutic procedures.  The physicians and surgeons as well as the person(s) in attendance for the performance of specialized medical services such as anesthesia, radiology, or pathology are not agents, servants or employees of the facility, but independent contractors and, therefore, are the patient's agents or servants.

<u>Dr. Shultz, Anesthesia Partners of Montana [APM] and YSC</u>.  Dr. Shultz joined APM in 1999.  *Shultz*, 9:11-18.[4]  He works for APM.  *Id*., 216:22-217:9.  Since joining APM he has practiced at St. Vincent Healthcare.  *Id*., 10:5-8.

The YSC is a "speciality hospital."  *M.C.A. §50-5-101(55)(a)(iii)*.  By definition, it is an "outpatient center for surgical services" meaning it is a facility

---

[3] *YSC Statement of Undisputed Facts* [*YSUF*], Ex. 1, p. 1, ¶1, "Informed Consent to Operation and Other Medical Services and Consent to Anesthesia" form from redacted Fabrizius medical records.

[4] Dkt. 30, Ex. 4

"... specifically designed and operated to provide surgical services to patients not requiring hospitalization ...." *M.C.A. §50-5-101(42)*. The YSC was organized in October 2001 as an independent limited liability company.[5]  It has an affiliation with St. Vincent Healthcare.[6]  It has been licensed by Montana as an outpatient ambulatory surgical center since it opened in November 2002.[7]

On October 1, 2002, the YSC entered into the *Agreement for Anesthesia and Medical Director Services* [*Agreement*][8] with APM.  Dr. Shultz was identified in the *Agreement* at Exhibit B as one of the APM doctors who would be providing anesthesia services for patients of surgeons and other doctors treating their patients at the YSC after it opened.  Thus, when the YSC opened in November 2002, he also began practicing there as an employee of APM.  *Agreement*, Art. 2.1; *Shultz*, 9:24-11:3.  APM bills separately for the services its employee doctors provide and the YSC charges a distinct facility fee.[9]  There has never been an employment agreement between Dr. Shultz and the YSC.[10]

However, the Plaintiffs rely on their interpretation of the terms of the YSC/APM *Agreement* as their evidence for proving he was an actual agent of the YSC on November 10, 2004.  Dkt. 29: 8/31/2009 *Plfs' Brief*, p. 6.

---

[5] *YSUF*, Ex. 3.

[6] *YSUF*, Ex. 4.

[7] *YSUF*, Ex. 5, p. 6: Answer to Interrogatory No. 8 & Response to Request for Production No. 11; Ex. 6: YSC-230 to YSC-232.

[8] *YSUF*, Ex. 7, YSC-138 to YSC-162.

[9] *YSUF*, Ex. 2.

[10] *YSUF* Ex. 5, p. 4: Response to Request for Production No. 5.

## Contract Interpretation

The construction and interpretation of a contract is a question of law for the Court to decide. *Taylor-Edwards Warehouse & Transfer Company of Spokane, Inc. v. Burlington Northern, Inc.*, 715 F.2d 1330, 1333 (9th Cir. 1983); *Wurl v. Polson School District No. 23*, 2006 MT 8, ¶16, 330 Mont. 282, 288, 127 P.3d 436, 441. In the Ninth Circuit there is no "rigid rule prohibiting reference to extrinsic evidence in resolving a contractual ambiguity on a summary judgment motion," the existence of which is a question of law. *Southern California*, 336 F.3d at 889; *Wurl*, ¶17. "Even if the proper interpretation of the meaning of the words of the contract depends upon the surrounding circumstances, the interpretation of the words in light of those circumstances is a question of law." *Taylor-Edwards*, 715 F.2d at 1333.

The mere fact that the parties disagree over the interpretation of a contract does not automatically create an ambiguity. *Wurl*, ¶17. The YSC disagrees with the Plaintiffs' interpretation in so many ways. But no matter how vigorous the debate, the agency-independent contractor issue is a question of law. *Cilecek v. Inova Health System Services*, 115 F.3d 256, 261 (Cir. 4th 1997), a case relied upon heavily by the Plaintiffs.

## YSC/APM *Agreement*

Relationship Designation. "In the performance of professional services ..." the *Agreement* specifically provides "... that Contractor [APM] and Anesthesiologists are at all times acting and performing as independent contractors practicing the profession of medicine." Art. 3.4.

Testimony that the anesthesiologists were independent contractors had an impact on the relationship question in *Butler* at ¶31 and ¶32. The provision in the YSC/APM *Agreement* is an important distinction from the contract examined in

*Kober and Kyriss v. Stewart and Billings Deaconess Hospital* (1966), 148 Mont. 117, 123, 417 P.2d 476, 479, which was silent on whether the radiologist was an independent contractor or an actual agent.  Labeling the radiologist as an independent contractor in the agreement in *Milliron* was a primary reason for not following *Kober*.  *Milliron*, 243 Mont. at 202, 793 P.2d at 826.  This contractual expression of the parties' intention alone was so conclusive on the actual agency issue in *Milliron* that the Plaintiffs were reduced to "... arguing the existence of an 'apparent' or 'ostensible' agency rather than an actual agency relationship." *Id*. The Fourth Circuit found that contractual expression very significant in affirming the lower court's decision that Dr. Cilecek was an independent contractor. *Cilecek*, 115 F.3d at 261.

Here, mutually with the YSC, APM expressed its intention that its anesthesiologist employees would act as independent contractors when providing professional services for patients at the YSC.  Art. 3.4.  The Plaintiffs seem offended that entities limit their liability exposure, and proclaim doing so violates their notion of public policy.  Yet, nothing in law prohibited the YSC or APM from agreeing on the nature of the relationship the YSC would have with the APM employees.

Direct Evidence of the Right or Exercise of Control.  The right of control is the most crucial factor in distinguishing between employees and independent contractors.  The "right of control" means the right to control the details, methods, or means of accomplishing the individual's work.  *Butler*, ¶29.

The YSC has never had the authority to exercise any control or direction over the methods used by the APM anesthesiologists.  Article 3.4 of the *Agreement* expressly says:

Surgery Center shall neither have nor exercise any control or direction over the methods by which Contractor [APM] or Anesthesiologists shall perform Anesthesia Services.  The sole interest and responsibility of Surgery Center is to assure that such services are performed in a competent, efficient and satisfactory manner.

*Competence*.  APM has always been responsible for ensuring the qualifications of the anesthesiologists it sends to the YSC.  Art. 2.2.  Medicare and Medicaid patients have come to the YSC for care from their doctors from the outset and APM intended its anesthesiologists would provide care for those patients.  Art. 7.1.  Thus, the YSC has been obligated to comply with the requirements of *42 C.F.R. §416.45* concerning the accountability of the medical staff to it.  In fulfilling its obligation, the YSC has a duty through its governing body to limit the medical staff appointments to those physicians who are legally and professionally qualified for the positions to which they are appointed.  *42 C.F.R. §416.45(a)* and the interpretive guidelines[11] for *42 C.F.R. §416.45(a)*, page 84.

However, *42 C.F.R. §416.45* does not address the independent contractor-actual agent question.  The rule that a Montana healthcare facility is not liable for doctors functioning as independent contractors would be meaningless if, as the Plaintiffs propose, certification of physicians providing care at the facility established a right of control.  To whatever degree facilities have a duty to monitor physicians, *42 C.F.R. §416.45* does not turn independent contractors into actual agents; nor does it change the criteria courts use for determining which the doctor is.  *Bender v. Suburban Hospital*, 998 F.Supp. 631, 633 (D. Md. 1998) (Plaintiffs'

[11] *YSUF*, Ex. 12: Appendix L: "Interpretive Guidelines for Ambulatory Surgical Centers" to the Department of Health and Human Services (DHHS) Centers for Medicare and Medicaid Services (CMS) Publication 100-07 entitled "State Operations Provider Certification."

case); *Butler*, ¶27; *Milliron*, 243 Mont. at 204, 793 P.2d at 827.  Regulatory compliance is not a right of control.

*Administrative Obligations and YSC Rules and Regulations*.  The Plaintiffs contend the administrative obligations imposed on the anesthesiologists and the requirements that they comply with rules and standards set by the YSC clearly established a right of control.  Not according to the cases they cite.

The jurists found that the rules and regulations Dr. Cilecek had to abide by governed every aspect of patient care but explained:

> All of these regulations, however, relate to the professional standard for providing health care to patients for which both Emergency Physicians and the Inova hospitals had professional responsibility to their patients.  While Cilecek certainly retained a professional independence in performing professional services, he also shared a professional responsibility to cooperate with the hospitals to maintain standards of patient care, to keep appropriate records, and to follow established procedures.  This shared control exists both for employee doctors and for doctors merely enjoying practice privileges at a facility.  If the hospitals did not insist on such details in the performance of professional services by doctors at their facilities, they would be exposing themselves to recognized professional liability.  Because of the overarching demands of the medical profession, the tension in professional control between doctors and hospitals for medical services rendered at hospitals is not, we believe, a reliable indicator of whether the doctor is an employee or an independent contractor at the hospital.

*Cilecek*, 115 F.3d at 261-62.  Requiring care for patients without adequate financial resources comes among those YSC regulatory requirements.

Staff privileges obligated Dr. Bender to regulations and activities similar to those in the YSC/APM *Agreement*.  The Court cited *Cilecek* for the proposition that hospitals can place administrative obligations on physicians with privileges in fulfilling the hospital's professional responsibility and observed, "In brief, obligations to participate in non-treatment related administrative activities do not transform doctors merely with privileges into independent contractors or employees." *Bender*, 998 F.Supp. at 636.  Retention of records at the YSC, in the

context of the foregoing and *42 C.F.R. §416.47*, does not help resolve the issue presented.

*Places of Practice and Timing of Providing Services at the YSC*.  The Plaintiffs contend the YSC controlled the places where Dr. Shultz could practice by requiring the APM anesthesiologists to maintain medical staff and admitting privileges at St. Vincent Healthcare.  Art. 4.1.  Misconstruing terms of the *Agreement*, they speculate that the YSC has scheduled the anesthesiologists for procedures at the facility and discarded them to their own devises when not needed.  Not true on either supposition.

As far as the YSC has been concerned, Dr. Shultz could practice wherever and whenever he wanted if APM let him.  While it is undisputedly true he has been obligated to maintain staff and admitting privileges at St. Vincent, and APM has been required to have anesthesiologists available during the YSC hours of operation for scheduled procedures with at least one remaining until the last patient is discharged [Art. 3.7], where and when Dr. Shultz performed his services has always been left to the internal operations of APM by the YSC.

"Normal operating hours," which the YSC can adjust, means "the time necessary to prepare for and complete cases scheduled from 7:30 a.m. to 4:30 p.m., Monday through Friday, excluding holidays."  Art. 3.7a.  At least one anesthesiologist had to be on premises "until the last patient is medically stable, and shall remain available until the last patient is discharged."  Art. 3.7d.  Among themselves, the anesthesiologists have had the flexibility of assigning the duty for staying on premises.  *Id*.  Initially, there were four operating room which the YSC could increase, *Id*., thus, placing more demand on APM.  APM knew and acknowledged "there may be wide fluctuations in the volume of cases scheduled on any given day and on certain days the schedule will not be full."  Art. 3.7e.

But, nowhere does the *Agreement* say the YSC will schedule the anesthesiologists.  That duty fell on and was undertaken by APM: "*Contractor shall provide and arrange for* the provision of all Anesthesia Services ...."  Art. 3.1 (*Emphasis supplied*).  It has been up to APM to learn how many procedures were scheduled at the YSC so it could schedule its anesthesiologists for work whenever and wherever it decided.  APM and Dr. Shultz have always had the freedom to come to an agreement about the number of hours he has been willing to work, or about the kind of work he has wanted to do, or where he wants to work, without any say from the YSC.

Article 3.5 grants APM the exclusive right to provide anesthesia services at the YSC.  The *Agreement* does not reciprocally require APM to limit the practice of its doctors to the YSC, however.  The YSC has never required Dr. Shultz to work at St. Vincent.  It only required him to have staff and admitting privileges if the need for emergency care arose for a patient he was treating at the YSC.

Those privileges gave APM latitude for scheduling him there, where he had been practicing before the YSC opened, if it didn't assign him for a procedure at the YSC or elsewhere.  The *Agreement* does not prohibit APM anesthesiologists from working wherever they can and want.  It was left to the ingenuity of APM to figure out how that could be accomplished while keeping its promise to the YSC.  For example, Dr. Shultz and some other APM anesthesiologists have had pain management privileges.  The *Agreement* has not prohibited APM from scheduling their "private" patients, as the Plaintiffs refer to them, for pain therapy while scheduling other employees to cover its obligation under Article 3.1.

Method of Payment.  APM has been solely responsible for separately billing and collecting "all professional fees and charges that result from professional

services provided in accordance with this Agreement."[12]  Art. 6.1a.  Nothing in the *Agreement* gave the YSC authority to determine the charges the APM anesthesiologists can charge for their services.  *Butler*, ¶31.

The YSC has never paid Dr. Shultz.[13]  Just as Emergency Services did in *Cilecek*, 115 F.3d at 261, APM has compensated him.  *Shultz*, 53:10-54:22; 197:10-199:8.  As in *Butler*, ¶31, APM does not share its income with the YSC.  The converse is true.  To APM, LLC, and other shareholders the YSC has distributed net earnings received from payments made by patients for facility fees.[14]  There is no evidence of the YSC having anything to do with deciding how much Dr. Shultz has ever received from the distribution to APM, LLC.  The evidence that he has never been a shareholder of the YSC tends to make the existence of his servitude less probable.

Right to Fire.  Referring to Articles 8.2 and 8.3, the Plaintiffs translate the ability of the YSC or APM to terminate the *Agreement* with or without cause into the right of the YSC to fire Dr. Shultz.  Stretching such a general ability for ending their obligations into a right to fire is nonsensical.  There would rarely if ever be independent contractors if such general contractual provisions for terminating an

---

[12]The YSC agreed to cooperate with APM's billing and collection process.  Art. 6.1a.  It also agreed it would "endeavor to distribute to Anesthesia Services patients materials provided by Contractor [APM] which describe the separate billing relationship between the patients and the Anesthesiologists."  Art. 6.1b.

[13]The YSC has never withheld for taxes, Social Security or any other withholdings for APM anesthesiologists.  Art. 3.4.  The YSC has never made workers' compensation, disability insurance benefits, unemployment compensation or unemployment insurance benefits, vacation pay, sick leave, Social Security, retirement benefits, or any other benefits available to the APM anesthesiologists.  *Id*.

[14]*YSUF*, Ex. 10, p. 3: Response Request for Production No. 14.

agreement meant a right to fire.  That either party had a right to terminate the relationship was not indicative of an employee relationship in *Cilecek*, 115 F.3d at 262.

Specifically though, the Plaintiffs' interpretation is without merit.  The YSC medical director from APM is expressly prohibited from terminating the services of an independent contractor healthcare professional in the name of the YSC. *Agreement*, Ex. A, ¶2.7.  Nothing anywhere else in the *Agreement* suggests the YSC has had any right to fire an anesthesiologist employed by APM.

Equipment Factor.  "Providing adequate space, equipment and personnel is nothing more than what a hospital provides other doctors for the treatment of their patients."  *Milliron*, 243 Mont. at 204, 793 P.2d at 827.  These were not dispositive facts favoring the Plaintiffs in *Butler*, *Kober*, *Cilecek*, or *Bender*.  They are not here either.

*Space*.  The YSC has provided the space where Dr. Shultz and other employees of APM have practiced when there.  Art. 5.1.  So did the facilities in *Kober*, *Milliron*, *Butler*, *Cilecek* and probably *Bender*.

It was agreed the APM anesthesiologists would not have an office at the YSC.  Art. 5.1.  In concluding Butler did not raise a genuine issue of material fact on the actual agency issue, ¶32, the Court noted that the anesthesiologists did not have individual offices at St. Patrick.  *Butler*, ¶31.  Providing an office for the physician was not a sufficient factual basis for establishing an agency relationship in *Milliron*, 243 Mont. at 204, 793 P.2d at 827.  In *Bender*, 998 F.Supp. at 633, the decision that Dr. Bender was an independent contractor was not derailed by the fact that the hospital provided her with office space.

The terms of the *Agreement* regarding space are not an indica of control as suggested by the Plaintiffs.  The fact that the YSC has not provided office space is

actually more of an indication that Dr. Shultz was not an employee of the YSC. *Butler*, ¶31 and ¶32.

*Equipment*.  According to Articles 5.2, 5.3, and 5.6, the YSC took responsibility for purchasing and furnishing the equipment and supplies.[15] Apparently, the only equipment the anesthesiologists provided in *Butler*, ¶31, was their anesthesia machines.  The hospital provided the equipment for the radiology department in *Milliron*, 243 Mont. at 203, 793 P.2d at 826.  The facilities furnished the equipment in *Cilecek*, 115 F.3d at 261; and also in *Bender*, 998 F.Supp. at 633.

*Personnel*.  APM and the YSC agreed the latter would employ all of the non-physician personnel needed for the delivery of anesthesia services.  Art. 5.7. The facilities provided staff to assist in *Bender*, 998 F.Supp. at 633.  The hospital provided the personnel for the radiology in *Milliron*, 243 Mont. at 203, 793 P.2d at 826.  Paragraphs 30 and 31 in *Butler* indicates St. Patrick's probably employed the non-physician personnel working with the anesthesiologists who performed the lumbar epidurals.

Providing adequate space, equipment and personnel is not enough to create an employment relationship even if there was also evidence that the YSC sent and collected bills for the care Dr. Shultz provided at the facility, which there is not. *Milliron,* 243 Mont. at 203, 793 P.2d at 826-27.

---

[15]APM agreed for itself and its anesthesiologists that none of them would obligate or commit the assets of the YSC for purchasing or acquiring equipment, supplies or personnel without written authorization.  Art. 5.4.  Likewise, they agreed they would not make or allow improvements or repairs to any space, facilities or equipment.  Art. 5.5.

### Pain Management and Nondelegable Duty Theory

The YSC/APM *Agreement* is a contract for the provision of anesthesia services at the YSC. It says "anesthesia services" will be broadly construed, "but shall not include treatment or management of chronic pain and painful disorders not done in conjunction with surgery or obstetrics." Art. 2.5 and 3.5. From this contractual constriction on the definition of "anesthesia services," the Plaintiffs go straight to the idea that Dr. Shultz was an agent of the YSC, not APM, when he did the Fabrizius ESI. Their reasoning seems to be that APM did not contract with the YSC to do pain procedures so APM anesthesiologists must have been acting outside the scope of their APM employment when they did those procedures at the YSC. Therefore, the Plaintiffs infer, the anesthesiologists must have been actual agent employees of the YSC rather than independent contractors when they provided treatment for pain. From there they trumpet the notion that pain therapy delivered at the facility is a business interest pursuit of the YSC and not of APM and its anesthesiologist employees. For conformation, they cite *M.C.A. §28-10-201* and *§28-10-211* and pronounce an actual agency existed for pain procedures by ratification from knowingly accepting and retaining the benefits of those procedures.

The problems with the Plaintiffs' hypothesis and conclusion begin with the facts. Foremost, are the billing facts. The Fabrizius ESI was billed and paid the same way the *Agreement* says anesthesia services would be treated, *i.e.*, APM billed separately for services its doctor employees provided. Art. 6.1a. APM was paid separately for Dr. Shultz. The YSC billed and was paid for a distinct facility fee.[16]

---

[16] *YSUF*, Ex. 2.

Their misunderstanding of the terms of the *Agreement* complicates the problem the facts cause them.  Articles 2.5 and 3.5 simply exclude most pain management procedures from the scope of the contract.  It does not prohibit APM from having its employee anesthesiologists perform those procedures at the facility.  The Plaintiffs forget that four of the nine doctors who had pain management privileges at the YSC on November 10, 2004, were not members of the APM group.[17]  APM and its anesthesiologists would not have had the exclusivity promised at Article 3.5 with physicians outside their group having pain privileges at the YSC.  Contract exclusivity was assured by constricting the definition of "anesthesia services" in the *Agreement*.

Another problem for the Plaintiffs' argument arises with the realization that "ratification" can be said of all of the procedures done at the facility.  The YSC has knowingly accepted facility fee benefits from the procedures done there.  Doing so has not transformed the independent contractor physicians treating their patients there into agent employees of the YSC for all of the reasons already given.

"Ratification" is their proclamation of a *res ipsa* concept that a facility owner has a nondelegable duty for the well being of a business invitee, and is strictly liable to one who has an unsatisfactory result while there.  Their argument is really a novel expression of a "nondelegable duty" theory for avoiding the general rule on vicarious liability.  It does not gain traction by being disguised as something else.

The well developed law of Montana provides that the mere fact of injury or the occurrence of an undesired result, standing alone, does not constitute evidence or raise a presumption or inference of negligence.  *Montana Deaconess Hospital*,

---

[17] *YSUF*, Ex. 10, p. 2: Answer to Interrogatory No. 9.

169 Mont. at 191, 545 P.2d at 673; *Loudon v. Scott* (1920), 58 Mont. 645, 194 Pac. 488, 491. The law does not require that for every injury there must be a recovery of damages. *Negaard v. Estate of Feda* (1968), 152 Mont. 47, 52, 446 P.2d 436, 439-40.  Consistent with *Doerr v. Movius* (1970), 154 Mont. 346, 350, 463 P.2d 477, 479, *Milliron* confirms the YSC did not promise or guarantee her a successful, satisfactory result merely because it let Dr. Shultz use the facility.

Mrs. Fabrizius was referred by her doctor, Dr. Copeland, to Dr. Shultz for the ESI to help make a diagnosis rather than being admitted as an in-patient who subsequently received it at the direction of someone at the YSC.  She knew Dr. Shultz would be doing the ESI before she left her doctor.  The ESI was not emergency care; nor was it provided at an acute care facility.  Under these circumstances the "ratification" theory of a nondelegable duty fails to trump the rule that a healthcare facility is not vicariously liable for the negligence of independent contractor physicians. *Milliron*, 243 Mont. at 204-05, 793 P.2d at 827-28.

<u>Ostensible Agency</u>.  Vicarious liability might occur if the YSC intentionally or negligently caused Mrs. Fabrizius to reasonably believe Dr. Shultz was its agent. *Butler*, ¶33 - ¶35, referring to *M.C.A. §28-10-103* and *§28-10-602*.  It must be the YSC, not Dr. Shultz or Dr. Copeland, "who 'intentionally or by want of ordinary care causes a third person to believe another to be [its] agent.'" *Sunset Point Partnership v. Stuc-O-Flex International, Inc.*, 1998 MT 42, ¶22, 287 Mont. 388, 394, 954 P.2d 1156, 1160.  Dr. Copeland sending her where the YSC provided space, equipment, and personnel for Dr. Shultz does not demonstrate intentional conduct by the YSC from which she could conclude Dr. Shultz was its agent. *Id.*; *Milliron*, 273 Mont. at 203, 793 P.2d at 826-27.

Here, unlike the *Butler* situation, the YSC informed Mrs. Fabrizius before the ESI that Dr. Shultz was an independent contractor and not its agent, servant or employee.[18]  This removes any reliance on *Butler*, ¶40, *et seq*., and the *Sword* case discussed therein as a legal basis for arguing an ostensible agency existed here.

If Mrs. Fabrizius was relying on *M.C.A. §28-10-103* and *§28-10-602* for establishing vicarious liability, her belief that Dr. Shultz was an agent of the YSC must be reasonable.  *Sunset Point*, ¶22.  To the extent the *Restatement (Second) of Torts §429* was adopted in *Butler*, ¶38, *et seq*., as a guide in assessing the issue, among the three things the Plaintiffs must show is that she looked to the YSC, rather than Dr. Shultz, for care before any belief she expresses can be deemed reasonable.  *Butler*, ¶39.  Her thoughts, conclusions and beliefs on November 10, 2004, confirm that she looked to Dr. Shultz for her care.

As in *Milliron*, 243 Mont. at 201, 793 P.2d at 825, the evidence[19] is that Dr. Copeland referred her to Dr. Shultz for the ESI to help make a diagnosis.  When she left Dr. Copeland's office she was going to see Dr. Shultz for care regardless of where he was.  She said, "I don't know the way that would have even crossed my mind" when asked if she cared about Dr. Shultz's relationship with the YSC when she went to see him.  *D. Fabrizius*, 168:22-169:1.  Her admissions, joined with Dr. Copeland's referral, negates any reliance on *Restatement (Second) of Torts §429* and a contention she looked to the YSC, rather than Dr. Shultz, for care.  Mrs. Fabrizius has no reasonable basis for now saying she thought he was an agent of the YSC.

---

[18]*YSUF*, Ex. 1, p. 1, ¶1.

[19]*See* "Events Leading to the C6-7 ... ESI" beginning at p. 3, *supra*.

## Conclusion

Summary judgment is appropriate if there is no genuine issue over any material fact and the movant is entitled to a judgment as a matter of law. *Fed.R.Civ.P. 56(c).* The Plaintiffs bear the burden of proof on all of the essential elements of their claim. *Southern California Gas Company v. Santa Ana,* 336 F.3d 885, 888 (9th Cir. 2003). "The ... burden of proving agency, including not only the fact of its existence but also its nature and extent, rests ordinarily upon the party who alleges it." *Elkins*, 153 Mont. at 165, 455 P.2d at 332. The Plaintiffs assert that there was an actual agency relationship between the YSC and Dr. Shultz on November 10, 2004.

Omissions of evidence, misstatements or misperceptions extracted from relevant evidence, factitious suppositions, and reliance on inadmissible evidence do not expose genuine issues of fact precluding summary judgment. A trial court can only consider admissible evidence in ruling on a motion for summary judgment. *Orr v. Bank of America,* 285 F.3d 764, 773 (9th Cir. 2002).

> Rule 56(c) requires entry of summary judgment "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986). "[A] complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Id.* at 323, 106 S.Ct. at 2552 (where nonmoving party would bear burden of proof at trial, moving party may rely on pleadings and allege that the nonmovant failed to establish an element essential to that party's case; nonmoving party must then designate specific facts showing there is a genuine issue for trial). The moving party must show the absence of a genuine issue concerning any material fact, but it need not produce evidence to do so; it may merely point out to the court the absence of evidence. *Id.* at 325, 106 S.Ct. at 2553.

*Maffei v. Northern Insurance Company of New York*, 12 F.3d 892, 899 (9th Cir. 1993); *Abraham v. Nelson*, 2002 MT 94, ¶11, 309 Mont. 366, 369-70, 46 P.3d

628, 631, and *Montana Deaconess Hospital v. Gratton* (1976), 169 Mont. 185, 190, 545 P.2d 670, 673 are in accord.

The evidence does not prove Dr. Shultz was an agent employee of the YSC, actual or ostensible.  The Plaintiffs have not fulfilled their burden.

The evidence does, however, require a conclusion that Dr. Shultz was an independent contractor when he did the ESI at Dr. Copeland's request.  *Butler*, ¶32; *Milliron*, 243 Mont. at 202-03, 793 P.2d at 826.  "Nondelegable duty" does not preclude the application of the general rule that the YSC is not vicariously liable for any negligence attributed to Dr. Shultz.  *Milliron*, 243 Mont. at 204-05, 793 P.2d at 827-28.  The YSC motion for summary judgment on this vicarious liability issue is appropriate and the Plaintiffs' motion should be denied.

### Certificate of Compliance

Pursuant to *L.R. 7.1(d)(2)* and *10.1(a)*, the undersigned certifies that the foregoing document is 5,974 words in length, excluding the caption and this certificate of compliance; is double spaced except for the quoted material and the footnotes; and is typewritten in 14 point font without erasures or materially defacing interlineations.

DATED, September 18, 2009.

KELLER, REYNOLDS, DRAKE,
 JOHNSON & GILLESPIE, P.C.
 __/s/ Richard E. Gillespie__
Richard E. Gillespie
Attorney for Yellowstone Surgery Center