FILED
BILLINGS DIV.

2009 DEC 15 PM 1 31

PATRICK E. DUFFY, CLERK
BY _____
              DEPUTY CLERK

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MONTANA,
BILLINGS DIVISION

| | | |
|---|---|---|
| DENISE FABRIZIUS and WILLIAM FABRIZIUS, | ) ) ) | Cause No. 08-114-BLG-RFC |
| Plaintiffs, | ) ) ) | |
| v. | ) ) | ORDER |
| DR. KEITH R. SHULTZ, M.D., YELLOWSTONE SURGERY CENTER, DOES 1 through X, and DOES 1 through X, inclusive, | ) ) ) ) ) | |
| Defendants. | ) | |

Currently pending before the Court is Plaintiffs' Motion for Summary Judgment regarding Defendant Yellowstone Surgery Center's (YSC) liability for the actions of Defendant Keith Shultz, M.D. [Doc. 28] and YSC's Motion for Summary Judgment regarding vicarious liability [Doc. 37]. The only issue regarding vicarious liability been succinctly narrowed to whether Dr. Shultz was

-1-

an independent contractor or actual agent of the YSC when he performed services on Plaintiff.

## I. BACKGROUND

Plaintiff made an appointment to see Dr. Copeland, a Billings neurosurgeon, on November 10, 2004, for a second opinion regarding pain symptoms. *D. Fabrizius*, 88:19-89:12. When he reviewed the previous MRI studies, Dr. Copeland saw spondylosis "Most prominently at C6-7 but also at C45- and C5-6." *Copeland*, 17:14-18:9. However, Dr. Copeland could not find diagnostic answers for the cause(s) of all her symptoms. *Id.*, 17:14-19:22, 20:22-21:5. The confusion between the symptoms she described and his objective finding was why ". . . I sent her for an epidural to see if I could add some clarity." *Id.*, 87:14-22. He wanted to see if there was a treatable problem he could help, so a cervical ESI was the next test he wanted done. *Id.*, 22:21-23:16.

Dr. Copeland recommended Plaintiff see Dr. Shultz for the ESI. *D. Fabrizius*, 168:4-8. The way she remembers it, "Dr. Copeland said something to the effect that if he knew somebody that was really good at this or – he made me feel comfortable with the fact that Dr. Shultz would be a good doctor to go to to have this done." *Id.*, 92:6-10. Dr. Copeland led Plaintiff "to believe that [Dr.

Shultz] was a good doctor and was good at what he does;" and evidently, that he preferred Dr. Shultz do the ESI. *Id.*, 168:4-12, 169:3-8. During the consultation Dr. Copeland arranged and scheduled a C6-7 ESI. *Copeland*, 26:13-27:14; *D. Fabrizius*, 91:12-18. The purposes were to help him make a diagnosis, *Copeland*, 18:24-19:22, 20:19-21:5, 22:10-23, along with the hope of it being therapeutic for her. *Copeland*, 22:24-23:13, *D. Fabrizius*, 91:6-9.

Dr. Copeland's referral was for Dr. Shultz, who happened to be at the YSC that day instead of St. Vincent Healthcare or elsewhere. When Plaintiff left Dr. Copeland's office she was going to see Dr. Shultz. *Id.*, 168:9-12.

When Plaintiff arrived at YSC she was informed before the ESI that Dr. Shultz was an independent contractor in paragraph 1 of the informed consent she signed:

> The Yellowstone Surgery Center maintains facilities and personnel to assist physicians and surgeons as they perform various surgical operations and other diagnostic of therapeutic procedures. The physicians and surgeons as well as the person(s) in attendance for the performance of specialized medical services such as anesthesia, radiology, or pathology are not agents, servants or employees of the facility, but independent contractors and, therefore, are the patient's agents or servants.

Dr. Shultz joined Anesthesia Partners of Montana (APM) in 1999. *Shultz*, 9:11-18. He works for APM. *Id.*, 216:22-217:9. Since joining APM he has practiced at St. Vincent Healthcare. *Id.*, 10:5-8.

On October 1, 2002, the YSC entered into the Agreement for Anesthesia and Medical Director Services (Agreement) with APM doctors who would be providing anesthesia services for patients of surgeons and other doctors treating their patients at YSC after it opened. Dr. Shultz was identified in the Agreement at Exhibit B as one of the APM doctors who would be providing anesthesia services for patients of surgeons and other doctors treating their patients at the YSC after it opened. Thus, when the YSC opened in November of 2002, Dr. Shultz began practicing there as an employee of APM. Agreement, Art. 2.1; *Shultz*, 9:24-11:3. APM bills separately for the services its employee doctors provide and the YSC charges a distinct facility fee. *Doc. 38*, Ex. 2. There is not an employment agreement between YSC and Dr. Shultz. *Doc. 38*, Ex. 5, p. 4: Response to Request for Production No. 5.

The Agreement specifically states: "In the performance of professional services under this Agreement, it is mutually understood and agreed that Contractor [APM] and Anesthesiologists are at all times performing as independent contractors practicing the profession of medicine. Surgery Center

-4-

shall neither have nor exercise any control or direction over the methods by which Contractor or Anesthesiologists shall perform Anesthesia Services." Agreement, Art. 3.4.

## II.  ANALYSIS

### A.  Summary Judgment Standard

Summary judgment is proper when "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). An issue is "genuine" only if there is a sufficient evidentiary basis on which a reasonable fact finder could find for the nonmoving party and a dispute is "material" only if it could affect the outcome of the suit under the governing law. *Anderson, v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986).

The party moving for summary judgment has the initial burden of showing the absence of a genuine issue of material fact. *Anderson*, 477 U.S. at 256-57. Once the moving party has done so, the burden shifts to the opposing party to set forth specific facts showing there is a genuine issue for trial. *In re Barboza*, 545 F.3d 702, 707 (9th Cir. 2008). The nonmoving party "may not rely on denials in

the pleadings but must produce specific evidence, through affidavits or admissible discovery material, to show that the dispute exists." *Id.*

On summary judgment, the evidence must be viewed in the light most favorable to the non-moving party. *Id.* The court should not weigh the evidence and determine the truth of the matter, but determine whether there is a genuine issue for trial. *Anderson,* 477 U.S. at 249.

**B.   Agency**

"Under Montana law, the construction and interpretation of a contract is a question of law for the court to decide." *State ex rel., Bullock v. Philip Morris, Inc.* 2009 MT 262 ¶ 16, 352 Mont. 30 ¶ 16.

Montana has codified the concept of *respondeat superior* at Mont. Code Ann. § 28-10-602. A principal is responsible to third persons for the negligence of his agent in the transaction of the business of the agency. Mont. Code Ann. § 28-10-602(1). "An agency may be created and an authority may be conferred by a precedent authorization or a subsequent ratification." Mont. Code Ann. § 28-10-201. An agency may be actual or ostensible. Mont. Code Ann. § 28-10-103(1). Actual agency exists when the agent is really employed by the principal. *Id.* A servant is one who is employed to provide services to another as opposed to

pursuing an independent calling and is under the control and direction of the employer, who is called the master. Mont. Code Ann. §39-2-601.

Generally, a Montana healthcare facility is not liable for the negligence of physicians functioning as independent contractors. *Butler v. Domin, et al.*, 2000 MT 312, ¶ 27, 302 Mont. 452, 459, 15 P.3d 1189, 1194, citing *Estates of Milliron v. Francke* (1990), 243 Mont. 200, 793 P.2d 824, 827.

"The law itself makes no presumption of agency, and the burden of proving agency, including not only the fact of its existence but also its nature and extent rests ordinarily upon the party who alleges it." *Elkins v. Huskey Oil Company* (1969), 153 Mont. 159, 165, 455 P.2d 329, 332. In Montana, direct evidence of the right or exercise of control, method of payment, furnishing of equipment, and the right to fire have been identified as the four factors used in determining whether a sufficient right of control existed to demonstrate an employer-employee relationship, i.e., an actual agency. *Butler*, ¶ 29.

### 1. RIGHT OR EXERCISE OF CONTROL

The right of control is the most crucial factor in distinguishing between employees and independent contractors. The "right of control" means the right to

control the details, methods, or means of accomplishing the individual's work. *Butler*, ¶ 29.

It is apparent that YSC did not have the authority to exercise control over APM anesthesiologists. The Agreement between the parties specifically stated: "Surgery Center shall neither have nor exercise any control or direction over the methods by which Contractor or Anesthesiologists shall perform Anesthesia Services." Agreement, Art. 3.4.

Plaintiffs contend the YSC controlled the location of where Dr. Shultz could practice by requiring APM to maintain medical staff and admitting privileges at St. Vincent Healthcare. However, it is clear that YSC was not responsible for scheduling anesthesiologists. That duty fell on and was undertaken by APM: "Contractor shall provide and arrange for the provision of all Anesthesia services. . ." Agreement, Art. 3.1. It was within the discretion of APM to appropriately schedule anesthesiologists for work. APM and Dr. Shultz had the freedom to come to an agreement about the number of hours Dr. Shultz would work, where he would be performing work, and what kind of work he would be doing. YSC did not have the right of control over any of that.

Additionally, it should be noted that Article 3.5 of the Agreement provides APM the exclusive right to provide anesthesia services at the YSC. However, the

Agreement does not reciprocally require APM to limit the practice of its doctors to the YSC . The agreement does not prohibit APM anesthesiologists from working at any location of their choice or from having "private" patients.

## 2. METHOD OF PAYMENT

It is undisputed that APM was solely responsible for the separate billings and collection of "all professional fees and charges that result from professional services provided in accordance with this Agreement." Agreement, Art. 6.1a. The YSC agreed to cooperate with APM's billing and collection process. Agreement, Art. 6.1a. It also agreed it would "endeavor to distribute to Anesthesia Services patients materials provided by Contractor [APM] which describe the separate billings relationship between the patients and the Anesthesiologists." Agreement, Art.6.1b.

Dr. Shultz was paid for his services by APM. YSC did not pay Dr. Shultz and the evidence is clear that Dr. Shultz was not a shareholder of the YSC. The YSC did not withhold taxes, Social Security or any other withholding for APM anesthesiologists. Agreement, Art. 3.4. The YSC did not make workers' compensation, disability insurance benefits, unemployment compensation or unemployment insurance benefits, vacation pay, sick leave, Social Security,

retirement benefits, or any other benefits available to the APM anesthesiologists. Agreement, Art. 3.4. Furthermore, there is no evidence of YSC having anything to do with deciding how much Dr. Shultz has ever received from the distribution of APM, LLC.

### 3. FURNISHING OF EQUIPMENT

The YSC provided space where Dr. Shultz and other employees of APM practiced when there. No part of the space provided by the YSC was to be used as an office for the private practice of medicine. *Agreement*, Art. 5.1. The fact that the YSC has not provided office space is more of an indication that Dr. Shultz was not an employee of the YSC. *See Butler*, ¶ 31.

According to Agreement, Art. 2.5, 5.3 and 5.6, the YSC took responsibility for purchasing and furnishing medical and office equipment reasonably necessary. This is not enough to create an employment relationship. The hospital provided the equipment for the radiology department in *Milliron*, 243 Mont. At 203. The facilities furnished the equipment in *Cilecek*, 115 F.3d at 261; and in *Bender v. Suburban Hospital*, 998 F.Supp. at 631, 633 (D. Md. 1998).

With regard to providing personnel, APM and the YSC agreed that the YSC would employ all of the non-physician personnel needed for the delivery of

anesthesia services. Agreement, Art. 5.7. This is consistent with the *Bender* and *Milliron* cases, where each hospital provided personnel to assist. *Bender*, 998 F.Supp. At 633; *Milliron*, 243 Mont. at 203.

**4. THE RIGHT TO FIRE**

Articles 8.2 and 8.3 of the Agreement discuss termination of the Agreement, with or without cause. This language does not translate into the right of YSC to fire Dr. Shultz. That either party had a right to terminate the relationship was not indicative of an employee relationship. *See Cilecek v. Inova Health System Services*, 115 F.3d 256, 262 (4th Cir. 1997).

## III. CONCLUSION

Based upon the foregoing, Plaintiffs' Motion for Summary Judgment regarding Defendant Yellowstone Surgery Center's (YSC) liability for the actions of Defendant Keith Shultz, M.D. [Doc. 28] is **DENIED**; and YSC's Motion for Partial Summary Judgment regarding vicarious liability [Doc. 37] is **GRANTED**.

DATED this 15th day of December, 2009.

RICHARD F. CEBULL
U.S. DISTRICT COURT JUDGE