IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MONTANA,
BILLINGS DIVISION

| | | |
|---|---|---|
| DENISE FABRIZIUS and<br>WILLIAM FABRIZIUS, | )<br>)<br>) | Cause No. 08-114-BLG-RFC |
| Plaintiffs, | )<br>) | |
| v. | )<br>**)**<br>) | **ORDER** |
| KEITH R. SHULTZ, M.D.,<br>YELLOWSTONE SURGERY CENTER,<br>DOES 1 through X, and Roe Corporations<br>I through X, inclusive, | )<br>)<br>)<br>)<br>) | |
| Defendants. | ) | |
| _____ | ) | |

Currently pending before the Court is Yellowstone Surgery Center's (YSC) Motion for Summary Judgment re Negligence and Consortium Claims. This matter is fully briefed and the Court is prepared to rule without oral arguments.

**I.   BACKGROUND**

Plaintiff made an appointment to see Dr. Copeland, a Billings neurosurgeon, on November 10, 2004, for a second opinion regarding pain symptoms. *D. Fabrizius*, 88:19-89:12. When he reviewed the previous MRI studies, Dr. Copeland

-1-

saw spondylosis "Most prominently at C6-7 but also at C4-5 and C5-6." *Copeland*, 17:14-18:9. However, Dr. Copeland could not find diagnostic answers for the cause(s) of all her symptoms. *Id.*, 17:14-19:22, 20:22-21:5. The confusion between the symptoms she described and his objective finding was why ". . . I sent her for an epidural to see if I could add some clarity." *Id.*, 87:14-22. He wanted to see if there was a treatable problem he could help, so a cervical ESI was the next test he wanted done. *Id.*, 22:21-23:16.

Dr. Copeland recommended Plaintiff see Dr. Shultz for the ESI. *D. Fabrizius*, 168:4-8. The way she remembers it, "Dr. Copeland said something to the effect that if he knew somebody that was really good at this or – he made me feel comfortable with the fact that Dr. Shultz would be a good doctor to go to to have this done." *Id.*, 92:6-10. Dr. Copeland led Plaintiff "to believe that [Dr. Shultz] was a good doctor and was good at what he does;" and evidently, that he preferred Dr. Shultz do the ESI. *Id.*, 168:4-12, 169:3-8. During the consultation Dr. Copeland arranged and scheduled a C6-7 ESI. *Copeland*, 26:13-27:14; *D. Fabrizius*, 91:12-18. The purposes were to help him make a diagnosis, *Copeland*, 18:24-19:22, 20:19-21:5, 22:10-23, along with the hope of it being therapeutic for her. *Copeland*, 22:24-23:13, *D. Fabrizius*, 91:6-9.

Dr. Copeland's referral was for Dr. Shultz, who happened to be at the YSC that day instead of St. Vincent Healthcare or elsewhere. When Plaintiff left Dr. Copeland's office she was going to see Dr. Shultz. *Id.*, 168:9-12.

When Plaintiff arrived at YSC she was informed before the ESI that Dr. Shultz was an independent contractor in paragraph 1 of the informed consent she signed:

> The Yellowstone Surgery Center maintains facilities and personnel to assist physicians and surgeons as they perform various surgical operations and other diagnostic of therapeutic procedures. The physicians and surgeons as well as the person(s) in attendance for the performance of specialized medical services such as anesthesia, radiology, or pathology are not agents, servants or employees of the facility, but independent contractors and, therefore, are the patient's agents or servants.

November 10, 2004 was the only day Plaintiff was at the YSC for care. *Doc. 38*, Ex. 1. There is no evidence of anyone giving YSC the names of care providers other than Dr. Copeland and asking that a copy of Plaintiff's records be sent to those providers. *Id*. There is no evidence of any treating physician asking for Plaintiff's records directly. *Id*. With the exception of the unsigned copy of Dr. Shultz's report found in Dr. Copeland's records, there is no evidence of any treating healthcare provider being sent any of the YSC records regarding Plaintiff's visit. *Id*.

In his deposition, Dr. Copeland denies reading reports like Dr. Shultz's in very close detail because the information is usually not very pertinent and in all likelihood he already has the information. *Copeland depo*. 72:5-73:3, 77:24-78:2. It does not appear that Dr. Copeland relied upon Dr. Shultz's unsigned report in trying to help Plaintiff with her complaint after the ESI. *Id.*, 30:18-43:6, 49:1-56:1. There is also no evidence of any treating healthcare provider relying on any of the YSC records in the course of caring for Plaintiff.

Dr. Shultz joined Anesthesia Partners of Montana (APM) in 1999. *Shultz*, 9:11-18. He works for APM. *Id.*, 216:22-217:9. Since joining APM he has practiced at St. Vincent Healthcare. *Id.*, 10:5-8.

On October 1, 2002, the YSC entered into the Agreement for Anesthesia and Medical Director Services (Agreement) with APM doctors who would be providing anesthesia services for patients of surgeons and other doctors treating their patients at YSC after it opened. Dr. Shultz was identified in the Agreement at Exhibit B as one of the APM doctors who would be providing anesthesia services for patients of surgeons and other doctors treating their patients at the YSC after it opened. Thus, when the YSC opened in November of 2002, Dr. Shultz began practicing there as an employee of APM. Agreement, Art. 2.1; *Shultz*, 9:24-11:3. APM bills separately for the services its employee doctors provide and the YSC charges a

distinct facility fee.  *Doc. 38*, Ex. 2.  There is not an employment agreement between YSC and Dr. Shultz.  *Doc. 38*, Ex. 5, p. 4: Response to Request for Production No. 5.

The Agreement specifically states: "In the performance of professional services under this Agreement, it is mutually understood and agreed that Contractor [APM] and Anesthesiologists are at all times performing as independent contractors practicing the profession of medicine.  Surgery Center shall neither have nor exercise any control or direction over the methods by which Contractor or Anesthesiologists shall perform Anesthesia Services."  Agreement, Art. 3.4.

On January 12, 2004, Dr. Shultz applied for staff privileges at the YSC to do multiple pain management procedures, including cervical ESIs.  *Doc. 38*, Ex. 8.  On February 10, 2004, the YSC credentialing committee approved staff privileges for Dr. Shultz to do multiple pain management procedures, including cervical ESIs.  *Id.*

Between March 29 and October 13, 2004, Dr. Shultz did seventeen cervical ESIs, none which forecast the complaints alleged in this case.  *Doc. 38*, Ex. 9.  The YSC credentialing committee reappraised Dr. Shultz and on November 10, 2004, again approved his staff privileges for anesthesia and pain management.  *Doc. 38*, Ex. 8 & 12.

## II. ANALYSIS

### A. Summary Judgment Standard

Summary judgment is proper when "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). An issue is "genuine" only if there is a sufficient evidentiary basis on which a reasonable fact finder could find for the nonmoving party and a dispute is "material" only if it could affect the outcome of the suit under the governing law. *Anderson, v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986).

The party moving for summary judgment has the initial burden of showing the absence of a genuine issue of material fact. *Anderson*, 477 U.S. at 256-57. Once the moving party has done so, the burden shifts to the opposing party to set forth specific facts showing there is a genuine issue for trial. *In re Barboza*, 545 F.3d 702, 707 (9th Cir. 2008). The nonmoving party "may not rely on denials in the pleadings but must produce specific evidence, through affidavits or admissible discovery material, to show that the dispute exists." *Id.*

On summary judgment, the evidence must be viewed in the light most favorable to the non-moving party. *Id.* The court should not weigh the evidence

and determine the truth of the matter, but determine whether there is a genuine issue for trial. *Anderson,* 477 U.S. at 249.

**B.     Negligence Claim – Medical Records**

Plaintiffs allege that YSC ". . . failed to maintain accurate, timely and complete medical records concerning the medical care provided by Dr. Shultz to Denice" Fabrizius. *Id.* ¶ 28. Plaintiffs assert that YSC " . . . caused and contributed through its negligence to Denice's post-procedure neurological injury, permanent disability, and damages." *Id.* ¶ 29.

Plaintiff has the burden of proving (1) the duties, *i.e.*, the standards of care applicable to the care she says should have been provided (2) that the YSC breached in a particular way or ways (3) which proximately caused (4) the injuries and damages claimed. Mont. Code Ann. § 26-1-401; *Montana Deaconess Hospital v. Gratton* (1976), 169 Mont. 185, 189, 545 P.2d 670, 672. If the plaintiff fails to offer proof of one of these elements, the action in negligence fails and summary judgment in favor of the defendant is proper. *Abraham v. Nelson*, 2002 MT 94, ¶ 11, 309 Mont. 366,  ¶ 11, 46 P.3d 628,  ¶ 11.

November 10, 2004, was the only day Plaintiff was at YSC with relation to this case. With the exception of the unsigned copy of Dr. Shultz's report found in

Dr. Copeland's records, there were no other treating healthcare providers who received any of the YSC records regarding Plaintiff's visit.

Dr. Copeland denies reading reports like Dr. Shultz's in very close detail because the information is usually not very pertinent and in all likelihood he already has the information. *Copeland depo*. 72:5-73:3, 77:24-78:2. Dr. Copeland did not rely upon Dr. Shultz's unsigned report in trying to help Plaintiff with her complaint after the ESI. *Id.*, 30:18-43:6, 49:1-56:1. There is no evidence that Dr. Copeland or his office received a copy of the signed report and there is no evidence of any treating healthcare provider relying on any of the YSC records in the course of caring for Plaintiff.

Plaintiff has failed to carry her burden of proof on the causation element. She has failed to present expert testimony favorable to her records claim. Additionally, when considering the undisputed facts, the YSC records could not have "caused or contributed to" the "post-procedure neurological" injury and damages claimed if subsequent treating physicians did not receive and rely on any of those records to the detriment of Plaintiff. There is no evidence that the YSC records caused or contributed to the injury or damages Plaintiff claims.

## C.     Negligence Claim – Clinical Competence

Plaintiffs have alleged that YSC "caused and contributed to" the injuries and damages by breaching a duty "to properly monitor and assure the clinical competence of Dr. Shultz . . ." *Second Amended Complaint* ¶ 27.

Dr. Patrick O. Faricy is the expert Plaintiffs rely upon to offer insight into what is meant by their allegation that YSC failed to "properly monitor and assure the clinical competence of Dr. Shultz." According to Dr. Faricy's disclosure, YSC failed to assign "a properly credentialed and approved physician proctor to oversee, supervise, and validate over time the demonstration of clinical competence by the requesting physician as to new clinical privileges. . ." *Doc. 38*, Ex. 11, July 27, 2009 report of Dr. Faricy's opinions.

It is an issue of law for the Court to determine what if any duties the YSC owed Plaintiff with regard to the clinical competence of Dr. Shultz. *Aasheim v. Humberger* (1985), 215 Mont. 127, 129, 695 P.2d 824, 826. "The custom and practice of one particular doctor, without knowledge of the general custom and practice among the profession, cannot establish a reasonable basis to infer that defendant departed from that practice. Nor does it infer that a doctor who does not follow that particular practice was negligent." *Collins v. Itoh* (1972), 160 Mont.

-9-

461, 471, 503 P.2d 36, 42, followed in *Montana Deaconess Hospital v. Gratton*, 169 Mont. at 189, 545 P.2d at 672.

Dr. Faricy provides no reference to evidence or authority that proctoring was a generally accepted standard of care that was widely used by facilities like the YSC in 2004. What Dr. Faricy would have done individually if he had been in charge of credentialing Dr. Shultz and granting pain management privileges does not establish the standard of care for the YSC in 2004; nor does it infer the YSC was negligent for not following the proctoring practice he suggests.

If there was an approved method for credentialing and granting staff privileges without proctoring, which there was in this case, the YSC cannot be held liable for selecting and following that method merely because Dr. Faricy thinks YSC should have followed a proctoring method. *Juedeman v. Montana Deaconess Medical Center* (1986), 223 Mont. 311, 321-22, 726 P.2d 301, 307-08; *Collins*, 160 Mont. at 471, 503 P.2d at 42.

Plaintiffs have not established that the YSC had a duty in 2004 to proctor Dr. Shultz before extending staff privileges that allowed him to do cervical ESIs. Plaintiffs' evidence does not prove a breach of duty by the YSC, nor does it suggest that the YSC caused or contributed to any of the injuries or damages claimed.

**D.     Consortium Claim**

William Fabrizius' consortium claim is derivative of the actions pleaded by his wife.  Mont. Code Ann. § 25-9-411(5)(a)(ii); *Mickelson v. Montana Rail Link, Inc.*, 2000 MT 111, ¶ 119, 299 Mont. 348, ¶ 119, 999 P.2d 985, ¶ 119.  Applying the *Mickelson* case, the YSC cannot be liable to William Fabrizius if it is not liable to his wife on her claims.

**III.    CONCLUSION**

Based upon the foregoing, YSC's Motion for Summary Judgment regarding Negligence and Consortium Claims [*doc. #36*] is **GRANTED**.  The Clerk of Court is directed to notify the parties of the making of this order and terminate YSC as a party in this case.

DATED this 4th day of January, 2010.

>       */s/ Richard F. Cebull*_____
>       RICHARD F. CEBULL
>       U.S. District Court Judge